908

**RUSSELL v. DOOLEY et al.**

No. 14673.

Court of Civil Appeals of Texas. Dallas.

July 10, 1953.

Rehearing Denied Sept. 25, 1953.

Henry Klepak and John P. Koons, Dallas, for appellant.

Saner, Jack, Sallinger & Nichols and Golden, Croley & Howell, Dallas, for appellees.

CRAMER, Justice.

W. Frank Russell as plaintiff instituted this suit in the District Court against B. V. Dooley and Mrs. L. C. Harrison, a widow, as defendants, for damages and penalty under art. 4004, R.C.S., alleging that Dooley misrepresented certain attributes of oil producing properties which were a material inducement to the purchase by Russell from Dooley of an interest in such oil properties. Russell further alleged that Mrs. Harrison was liable to him by reason of benefits received by her in the reduction of the principal of a note on which she and Dooley were co-signers.

Dooley and Mrs. Harrison filed motion for summary judgment and the court having sustained such motion and entered judgment thereon, Russell has perfected this appeal. He asserts two points of error, in substance: (1) A material disputed fact issue was raised for the jury, (2) which was beyond the province of the trial court to decide on a motion for summary judgment. It was undisputed that on May 7, 1951 Russell purchased from Dooley a certain undivided interest in an oil and gas lease on three certain tracts of land located in Cooke County, Texas. Russell pled in substance that it was represented to him that the Felderhoff tract No. 5 and Felderhoff Tract No. 15 each had four producing wells located thereon and that the Solomon tract had nine producing wells thereon; that each and all such wells were producing and had produced their allowable since the beginning of their operation. That in truth and in fact such wells had not always produced their allowable but had in various months and particularly those during the negotiation of the sale from Dooley to Russell failed to produce their allowable, but that oil was pumped from storage tanks, and payments were made to the interest holders in amounts substantially equal to the allow-

able on their interests; that Dooley was an experienced oil man and that he, Russell, was a complete novice; that Dooley represented the wells were a 26-months pay out, that is to say, his investment would be recovered in 26 months; when in truth and in fact in a period of five months after the transaction involved the royalty payments had reduced to almost one-third the amount represented. The reductions commencing with increased rapidity the months subsequent to the sale here involved. Russell also alleged Dooley represented the fair market value of the interests here involved to be $15,500, when in truth and in fact the fair market value was less than $5,500.

Dooley, after filing his answer, filed his motion for summary judgment supported by his affidavit in which he under oath stated in substance that he was over 21 years of age, of sound mind, had never been convicted of any crime or offense, had personal knowledge of every statement in the affidavit. He denied he ever represented to Russell that if he would pay $15,500 for the lease in question he would recover therefrom a sum of money equal to his investment in 26 months; denied he ever represented to Russell that the oil wells on the lease in question were making their allowable in May, 1951, or that he would receive a monthly income of not less than $600 per month, or that he would recover his investment in 26 months. Denied that he represented to Russell that he had been in the oil business for a number of years; denied that he stated he was well acquainted with the lease in question and that all of the wells were producing their allowable; denied that he withheld from Russell information as to production of the wells in question, but asserts that he showed Russell the production records of such wells and discussed with him the fact that the production on the lease had declined since March 1951; denied that he at any time represented to Russell that for a period of 5⅔ months he would receive an income of $3,400 from such wells; denied he at any time conspired to defraud Russell or that he at any

time willfully and fraudulently misrepresented that the leases would produce a monthly income of $600; denied that he withheld information from Russell regarding the production record of such wells or an engineering report covering such wells; but stated affirmatively that he did not know in May 1951 that a reserve had been accumulated in prior months and that oil would be taken from tanks as well as from the wells in order to bolster the income for the months of May and June 1951; denied he withheld from Russell any information he had regarding the condition of the wells for the purpose of perpetrating a fraud on Russell; or that he withheld any information from him as to what the wells had been producing in the past. He further denied that he ever represented to Russell that the income from the wells in question would average for the next 26 months after the sale the sum of $600 per month.

The only question on this appeal is whether Russell made such a showing under oath, as that, on a jury trial the court would be justified in giving an instructed verdict in favor of Dooley against Russell. There is no question that the affidavit of Dooley taken alone would justify the court's judgment, but the question here, on this record, is whether, assuming Russell's evidence to be true, a fact issue is raised for the jury.

Fraud material here involves the following fact issues: (1) A representation, or representations, that a definite condition or fact then existed; (2) that such condition or fact did not in truth then exist; (3) that the representation, or representations, were made to induce Russell to enter into the transaction here involved; (4) that Russell did rely thereon; (5) that such representation, or representations, were a material inducement to Russell's entering into the contract; and (6) damage to Russell.

Defensive fact issues are: (1) Prior knowledge by Russell of the true condition; or (2) his ability, in the exercise of ordinary care, before the sale, to ascertain

the true facts about the property purchased.

A review of Russell's evidence shows he, in rebuttal to the affidavit, offered his deposition in which he testified to two transactions, one in which the sale was by Mrs. Harrison, not a party to this appeal, which took place in March, and the one in May 1951 when he purchased a fractional interest in the same property from Dooley. Russell, on his affirmative issues, testified that he was and had been for 18 years an automobile manufacturer's agent and had never been in the oil business prior to the transaction here involved. He learned of the lease here involved from Mr. Jacobson whom he had known for some 14 years; then from Dooley. He had told Jacobson he might be interested in making an investment and that if he saw something good to let him know. Jacobson had theretofore been investing some money in oil. On the deal here, Jacobson told him he thought it was a good one; that he had bought an interest therein for his sister. Dooley had known Jacobson for a number of years and knew Jacobson had known Dooley for a number of years; also that Jacobson considered Dooley reliable.

■ The evidence on the first transaction in March, between Harrison and Russell, was admissible only on the issue of knowledge, by Russell, of the property and its value before the second transaction in May, and was material for that purpose only.

Russell testified that Jacobson before the first purchase told him the wells were producing; that the monthly payments on the first transaction were approximately $290 per month. Dooley told him substantially the same and added that the interest was owned by Wilson Brothers who needed to sell to pay income taxes; that the property there was a 30-months pay-off. On the closing of the sale he learned the property was not owned by Wilson Brothers but by a Mr. Harrison.

On the second transaction in May, the one involved here, he dealt directly with Dooley and made his purchase from him. He testified Dooley showed him a map of the field and told him that he was an experienced oil man; that he, Russell, believed and relied on Dooley's statements to the effect that the interest, in the second transaction, was paying $600 per month and that it was a 26-months pay-off; that $15,500 was its fair market value. Russell testified that Dooley said, "When you were drilling a well that would be speculative, but production in any wells that were producing was like buying whole wheat from the mill. It was proven. * * * The thing that Dooley stressed most was production of wells in this field was as long as 20 years, and he referred many times to the wells owned by the Texas Company in that field area that were producing for 20 years." And as follows:

"Q. Didn't Mr. Dooley caution both of you that no one could tell what would happen in the future, and certainly the investment was something of a gamble like most investments in the oil business? A. No sir. Mr. Dooley represented the investment to be very good, and that we would not only get our money back but make money from it.

"Q. He gave that as his opinion, did he not? A. Yes sir.

"Q. Did you go and make any inquiry of any other person, Mr. Russell? A. No sir."

He further testified he knew after the first transaction that the runs for March were something less than $250 on the first interest and that the wells in March did not make their allowable; but he also testified: "I asked Mr. Dooley why it wasn't the amount it was represented to be. Mr. Dooley told me they had been cleaning out some wells up there and also Wilson Brothers were operating two of the tracts at that time and the Harrison one, and that the Wilson operation was not good, and there was a movement on foot to transfer the entire operation over to the Harrison's, and he thought when the Harrison's got it, that they knowing better how to operate the lease than the Wilson

Brothers did, that then it would be all right and back where it was before."

He testified he knew Dooley wasn't operating the property. He did not inquire about the matter from either Mr. Harrison or Wilson Brothers as to why the production dropped off. He did not offer to buy the interest. "* * * Mr. Dooley offered them for sale telling me that he had some other leases that he was interested in and he needed the money for them, and if he didn't need the money he wouldn't sell the leases, or sell the working interest, but that he needed the money for that, and he wanted to sell them, and he would sell them at a very advantageous figure of 26 months pay out." Dooley did tell him he was having trouble with the four wells on the Solomon ten-acre lease in the same vicinity and that was one reason he wanted to raise some money. Dooley did not show him the runs statements but did show him a report by a Gainesville geologist. However he did not read the geologist's report. Dooley pointed out to him the high-lights and details of the report and the log and told him he had been receiving $600, or five hundred and some odd dollars a month from the interest and offered to sell it for 26 times what it was paying. He did not say he would guarantee that much or he would give him his money back. He did state: "Well, he said the wells, on the Felderhoff Tract, on the first tract drilled, was a very good tract, and the second Felderhoff Tract was also good, but the Solomon was the discovery tract and they had been producing for those eight months or more, whatever it happened to be when they were drilled, and how he was up there when it came in, and how he had been in on the field, and that this stuff around there was good, and the wells of the Texas Company had been producing for 20 years, and at 26 months pay out I would get my money back, and above that it would be all velvet and gravy, and it should go along and be a very wonderful investment."

He also testified:

"Q. Aside from the fact that you haven't gotten the same amount for the 26 months, were any of the other statements you have made untrue according to your present contention here? A. I believe he knew at that time that the wells were not producing that much and wouldn't produce that long.

"Q. How much do you say they were then producing? A. The percentage on it I do not know.

"Q. What did he say, that is what I am talking about, not what you believe. What did he say the wells were producing on May 7, 1951 when you made the deal? A. He said they were producing that amount of approximately $600, and in 26 months they would pay out."

He further testified he first discovered the wells were not going to pay out as promised on October 15, 1951 at a meeting in the Harrison Oil Company attended by all owners. Dooley was there only during the last part of the meeting. Testifying as to what happened at the meeting, he stated: "A. Why Mr. Dewey Smallwood asked questions of Mr. Allen, Mrs. Harrison's representative; what happened to the production of the wells. After quite a bit of discussion by Mr. Allen, Mr. Allen made the statement that these wells had fell off in February and March of 1951, and when he was asked why for several months did the check hold up, he said they had pumped into the tanks oil above their allowable and was selling out the allowable each month until the reserve was gone." He there learned Dooley had misrepresented things to him. He also testified:

"Q. Now, isn't it a fact what Mr. Allen said was the production had begun to drop off in April; isn't that what he said instead of February and March? A. No sir.

"Q. He didn't say in April? A. He didn't say in April.

"Q. Isn't it a further fact that he stated that they had over produced their allowable in some of the months in the early part of the year and had put about 800 barrels of storage on hand in tanks and they sold that storage oil in addition to their allowable; isn't that what he said?

A. He stated that also, that they had produced more than the allowable—

"Q. That is right. A. —and they had, when production first fell off, they had sold what they had produced above the allowable, and that was the reason that in March and April and a few of those months following, that the checks still didn't drop off as rapidly as they had in October.

"Q. But you knew the wells produced their allowable in March, Mr. Russell, didn't they? A. That I don't know.

"Q. Do you say now they didn't produce their allowable in March? A. I don't know whether they produced their allowable in March or not. I don't know. I don't know what the allowables are for the wells. That I have never confirmed.

"Q. You say Mr. Allen said they didn't produce their allowables in March and February? A. May I make that statement again?

"Q. Yes sir. I want to be clear about the months you say he said they didn't produce their allowable. A. Mr. Allen made the statement that the wells fell off and declined in February and March."

Paul Jacobson testified by deposition, material here, that when he got the figures from Dooley he passed them on to Russell; he did not make an investigation. He recommended to his sister that she buy, but did not make a recommendation to Russell. That the field took a sudden drop in production. On the closing of the deals no objection was made that they did not recite the amount of the production and the length of the pay out.

He also testified:

"Q. You did know the oil business was a risky business, didn't you? A. We knew if you drilled you could bring in a dry hole or bring in a well, but we presumed when we bought wells already producing we couldn't get hurt.

"Q. You did know production goes up and down and varies with the field condition. A. We knew very little about it.

"Q. You made no effort to investigate any of the facts or conditions, did you? A. No. No. We didn't."

Under the above record there were fact issues for the jury on the issues of fraud and damage, hereinabove set out. Such being the state of the record, it follows that the trial court erred in entering a summary judgment, and that the judgment below should be reversed and the cause remanded for a trial on the merits.

It is so ordered.